**In the Matter of George E. MORRIS and Angelika Mercer Morris, et al., Debtors.**

**George E. MORRIS and Angelika Mercer Morris, et al., Plaintiffs,**

**v.**

**ASSOCIATES FINANCE COMPANY, et al., Defendants.**

**Bankruptcy Nos. 79 B 39137, 80 A 63.**

United States Bankruptcy Court, N. D. Illinois, E. D.

June 24, 1981.

Robert Gray, Joliet, Ill., for Morris.

Harold Shabelman, Joliet, Ill., for Associates Finance Co.

## OPINION AND ORDER

RICHARD L. MERRICK, Bankruptcy Judge.

This cause comes on for decision upon the pleadings in nineteen separate cases [1] which

---

1. The following cases are those in which the § 522(f)(2) liens arose before the enactment of the Code and which encumber only household goods.

1. In the matter of (79 B 13292)
 JAMES BRANDY,
 Debtor,

JAMES BRANDY,
 Plaintiff,

 vs. (80 A 2346)

AVCO FINANCIAL SERVICES,
 Defendant.

2. In the matter of
 AMERTEEN CALLOWAY, (80 B 12865)
 Debtor,

 AMERTEEN CALLOWAY,
 Plaintiff,

 vs. (80 A 2469)

GENERAL FINANCE CORPORATION,
 Defendant.

3. In the matter of (80 B 10972)
 JIM COHN, JR. and
 LINDA M. COHN,
 Debtors,

 JIM COHN, JR. and
 LINDA M. COHN,
 Plaintiffs,

 vs. (80 A 2114)

AVCO FINANCIAL SERVICES,
 Defendant.

4. In the matter of
 ALFRED JONES, JR. and (80 B 12972)
 CAROL ANN JONES,
 Debtors,

 ALFRED JONES, JR. and
 CAROL ANN JONES,
 Plaintiffs,

 vs. (81 A 303)

MIDLAND FINANCE COMPANY,
BENEFICIAL FINANCE COMPANY,
GENERAL FINANCE COMPANY
OF ILLINOIS,
 Defendants.

5. In the matter of (80 B 6534)
 JOSEPH SIMS,
 Debtor,

 JOSEPH SIMS,
 Plaintiff,

 vs. (80 A 1068)

AVCO FINANCIAL SERVICES,
 Defendant.

6. In the matter of (80 B 4322)
 RALPH A. TRANKINA and
 THERESA A. TRANKINA,
 Debtors,

 RALPH A. TRANKINA and
 THERESA A. TRANKINA,
 Plaintiffs,

 vs. (80 A 633)

ASSOCIATES FINANCIAL SERVICES,
 Defendant.

In the following cases, the § 522(f)(2) liens
were also created prior to the enactment of the
Code, but the collateral included motor vehicles
and household goods.

7. In the matter of (80 B 1077)
 PAUL BAILEY and
 ANNA BAILEY,
 Debtors,

PAUL BAILEY and
ANNA BAILEY,
 Plaintiffs,

 vs. (80 A 619)

COMMERCIAL CREDIT
CORPORATION,
 Defendant.

8. In the matter of (80 B 5580)
 WILLIE G. GRADY and
 WILLIE B. GRADY,
 Debtors,

 ASSOCIATES FINANCE COMPANY,
 Plaintiff,
 vs. (80 A 1281)

 WILLIE G. GRADY and
 WILLIE B. GRADY,
 Defendants.

9. In the matter of (80 B 584)
 MARY DELORES MARSHALL a/k/a
 DELORES MARSHALL,
 Debtor,

 BENEFICIAL FINANCE COMPANY,
 Plaintiff,
 vs. (80 A 437)

 MARY DELORES MARSHALL a/k/a
 DELORES MARSHALL,
 Defendant.

10. In the matter of (80 B 5326)
 CHARLES SCHRYER and
 YVONNE L. SCHRYER,
 Debtors,

 BENEFICIAL FINANCE COMPANY,
 Plaintiff,
 vs. (80 A 887)

 CHARLES SCHRYER and
 YVONNE L. SCHRYER,
 Defendants.

In the following three cases, the liens arose
during the "gap" between the enactment and
effective dates of the Code. The liens covered
household goods only.

11. In the matter of (80 B 14061)
 MARTIN DAMSKER and
 ROSEMARIE DAMSKER,
 Debtors,

 BENEFICIAL FINANCE COMPANY,
 Plaintiff,
 vs. (80 A 2413)

 MARTIN DAMSKER and
 ROSEMARIE DAMSKER,
 Defendants.

(Note that in this case, there are two loans, one
during the gap period and one during the post-
effective period.)

12. In the matter of (80 B 1254)
 WALTER C. KRAKOWSKY and
 LINDA M. KRAKOWSKY,
 Debtors,

 BENEFICIAL FINANCE COMPANY,
 Plaintiff,
 vs. (80 A 436)

have been consolidated for trial because all of them raise the question of the constitutionality of Section 522(f) of the Bankruptcy Code.[2] In each case, except one, one of the parties is a consumer debtor (usually spouses as joint debtors) and the other party is a finance company. In each instance, with the same single exception, the debt at issue is a consumer installment loan which has been secured by the granting of a security interest in household goods, and in seven instances in motor vehicles as well.

The exception of the generalities of the nineteen cases is the isolated case in which the creditor has a judicial lien which the debtor seeks to avoid under § 522(f)(1). Creditors are defendants in twelve of the cases and plaintiffs in seven.

During the period that the nineteen cases were filed, the Federal exemptions of § 522(b)(1) of the Code were available to residents of Illinois, which all of the debtors are.[3] No question was raised in any of the cases as to whether the allowable amount of

WALTER C. KRAKOWSKY and
LINDA M. KRAKOWSKY,
 Defendants.

13. In the matter of (79 B 39137)
 GEORGE E. MORRIS and
 ANGELIKA MERCER MORRIS,
 Debtors,

 GEORGE E. MORRIS and
 ANGELIKA MERCER MORRIS,
 Plaintiffs,

 vs. (80 A 63)
 ASSOCIATES FINANCE COMPANY,
 Defendant.

The following cases are gap cases and involve motor vehicles as well household goods.

14. In the matter of (80 B 1077)
 PAUL BAILEY and
 ANNA BAILEY,
 Debtors,

 PAUL BAILEY and
 ANNA BAILEY,
 Plaintiffs,

 vs. (80 A 621)
 BENEFICIAL FINANCE COMPANY,
 Defendant.

15. In the matter of (80 B 1773)
 LYLE G. BEATTIE and
 LYNN N. BEATTIE,
 Debtors,

 BENEFICIAL FINANCE COMPANY,
 Plaintiff,

 vs. (80 A 489)
 LYLE G. BEATTIE and
 LYNN N. BEATTIE,
 Defendants.

16. In the matter of (80 B 6167)
 RICHARD D. KELLEMS and
 MARTHA V. KELLEMS,
 Debtors,

 ASSOCIATES FINANCIAL SERVICES,
 Plaintiff,

 vs. (80 A 1153)
 RICHARD D. KELLEMS and
 MARTHA V. KELLEMS,
 Defendants.

The next two cases involve liens created on household goods after the effective date of the Code.

17. In the matter of (80 B 1077)
 PAUL BAILEY and
 ANNA BAILEY,
 Debtors,

 PAUL BAILEY and
 ANNA BAILEY,
 Plaintiffs,

 vs. (80 A 620)
 BENEFICIAL FINANCE COMPANY,
 Defendant.

18. In the matter of (80 B 14937)
 DAVID A. WALSH and
 KATHERINE WALSH,
 Debtors,

 DAVID A. WALSH and
 KATHERINE WALSH,
 Plaintiffs,

 vs. (80 A 2309)
 GENERAL FINANCE CORPORATION,
 Defendant.

The final case is brought under § 522(f)(1) and concerns a judicial lien obtained during the gap period.

19. In the matter of (80 B 16872)
 JAMES R. PAWLOWSKI and
 CHERYL PAWLOWSKI,
 Debtors,

 JAMES R. PAWLOWSKI and
 CHERYL PAWLOWSKI,
 Plaintiffs,

 vs. (81 A 750)
 EXECUTIVE COMMERCIAL SERV-
 ICES CORPORATION,
 Defendant.

2. The Bankruptcy Code of 1978, enacted November 6, 1978 as Title I of the Bankruptcy Reform Act of 1978, Pub.L.No.95–598, §§ 101–151326 (1978).

3. Illinois is one of sixteen or more states which have decided to limit the exemptions available to their residents to those permitted by state law. Illinois "opted out" of the Federal exemptions in 1980. Ill.Rev.Stat. ch. 52, § 101 (1981) (West).

the exemptions was large enough to cover the value of the collateral, so that for the purposes of this decision it is the law of the case that the value of the collateral did not exceed the amount of exemptions available to the debtors.

In ten of the nineteen cases the security interest was created prior to November 6, 1978 [4] and from time to time those interests may be referred to as "pre-enactment liens." In six of the nineteen cases the security interest was created between November 6, 1978 and October 1, 1979,[5] and those interests may be referred to as "gap liens." In two of the cases the security interest was created after October 1, 1979, and those interests may be referred to as "post-effective liens." One case involves two notes executed at different times, one supporting a gap lien and one supporting a post-effective lien. For reasons discussed more fully below, the distinction is not important to this discussion, as the legal result is the same in any event. The United States of America intervened in support of the constitutionality of § 522(f)(1) and § 522(f)(2).

Although briefs were not filed in many of the cases, the issues have been briefed extensively, and no party has suffered because the facts peculiar to his own case have not been stressed separately. Similarly every party has had an opportunity to have his case argued orally, but some counsel declined to make oral judgment, possibly heeding the suggestion of the Court that nothing would be gained by having the same point raised nineteen times. In three of the cases the question of the value of the collateral has been placed at issue; these three cases will not be disposed of finally by this decision but will be subject to supplementary special subsequent trials at which evidence may be introduced respecting the value of the collateral.

The Court has considered the briefs submitted and the arguments made, as well as the decisions of many courts classified below,[6] and feels that generally they are not

---

**4.** The date that the act was approved by the President.

**5.** The effective date of the substantive provisions of the Code. "Except as otherwise provided in this title, this Act shall take effect on October 1, 1979." Pub.L.No.95–598, § 402(a) (1978).

**6.** This Court has found thirty-nine reported cases in which the constitutionality of section 522(f) was in issue. For those cases holding the avoidance of pre-enactment liens constitutional *see In re Ambrose*, 4 B.R. 395, 2 Collier 2d 267, 6 B.C.D. 454 (Bkrtcy.N.D.Oh.1980); *In re Baker*, 5 B.R. 397, 2 Collier 2d 844 (Bkrtcy. W.D.Mo.1980); *In re Campbell*, 8 B.R. 425 (Bkrtcy.S.D.Oh.1981); *In re Curry*, 5 B.R. 282, 2 Collier 2d 710 (Bkrtcy.N.D.Oh.1980); *In re Fisher*, 6 B.R. 206 (Bkrtcy.N.D.Oh.1980); *In re Goodrich*, 7 B.R. 590 (Bkrtcy.S.D.Oh.1980); *In re Joyner*, 7 B.R. 596, 3 Collier 2d 436 (Bkrtcy. M.D.Ga.1980); *In re Paden*, 10 B.R. 206 (E.D. Pa.1981); *In re Pillow*, 8 B.R. 404 (Bkrtcy.D. Utah 1981); *In re Rutherford*, 4 B.R. 510, 2 Collier 728 (Bkrtcy.S.D.Oh.1980); *In re Stump*, 8 B.R. 516 (Bkrtcy.D.S.D.1981); *In re Sweeney*, 7 B.R. 814, 3 Collier 2d 523, 6 B.C.D. 1377.

For cases holding the avoidance of pre-enactment liens unconstitutional *see In re Bibb*, 10 B.R. 40 (Bkrtcy.E.D.Mich.S.D.1981); *In re Felmey*, 9 B.R. 331 (Bkrtcy.E.D.Va.1981); *Groves v. Household Finance Co.*, 9 B.R. 775 (Bkrtcy. D.Col.1981); *In re Hammer*, 9 B.R. 343 (Bkrtcy.

N.D. Iowa 1981); *In re Hawley*, 4 B.R. 147, 2 Collier 2d 80, 6 B.C.D. 365 (Bkrtcy.D.Ore.1980); *In re Lovett*, 11 B.R. 123, 7 B.C.D. 585 (W.D. Mo.1981); *In re Sams*, 9 B.R. 479 (Bkrtcy.N.D. Oh.1981); *In re Williams*, 8 B.R. 562 (Bkrtcy.E. D.Wash.1981); *Rodrock v. Security Industrial Bank*, 642 F.2d 1193, 7 B.C.D. 344 (10th Cir. 1981). (In *Rodrock*, seven pre-enactment cases were consolidated on appeal to the Circuit Court).

In eight cases, avoidance of gap liens was found to be constitutional. *See In re Beck*, 4 B.R. 661, 2 Collier 2d 738, 6 B.C.D. 491 (Bkrtcy. C.D.Ill.1980); *In re Head*, 4 B.R. 521, 2 Collier 2d 366, 6 B.C.D. 489 (Bkrtcy.E.D.Tenn.1980); *In re Fennell*, 9 B.R. 340 (Bkrtcy.D. Idaho 1981); *In re Kursh*, 9 B.R. 801, 7 B.C.D. 592 (Bkrtcy.W.D.Mo.1981); *In re Prim*, 6 B.R. 142, 2 Collier 2d 1170 (Bkrtcy.D.Kan.1980); *In re Steinart*, 4 B.R. 354, 2 Collier 2d 166, 6 B.C.D. 623 (Bkrtcy.W.D.La.1980); *In re Teske*, 9 B.R. 18 (Bkrtcy.W.D.Mich.1981); *In re Webber*, 7 B.R. 580 (Bkrtcy.D.Ore.1980).

In three cases avoidance of gap liens was held to be unconstitutional. *See In re Lucero*, 4 B.R. 659, 2 Collier 2d 532, 6 B.C.D. 477 (Bkrtcy. D.Colo.1980); *In re Wells*, 7 B.R. 875, 7 B.C.D. 11 (Bkrtcy.D.Colo.1980); *In re Woods*, 9 B.R. 325 (Bkrtcy.E.D.Mich.1981).

Two courts refused to decide the constitutional issue. *See In re Baker*, 5 B.R. 397, 6 B.C.D. 747 (Bkrtcy.W.D.Mo.1980); *In re Boulton*, 4 B.R. 498, 1 Collier 2d 817, 6 B.C.D. 233 (Bkrtcy.S.D. Iowa 1980).

persuasive because they do not deal with fundamentals but represent a superficial approach to a basic issue, particularly is this true in their discussions of the *Radford* case.[7] As an exposition of the law and as an analysis of the issues touching on the constitutionality of § 522(f), this Court has found most of the writings deficient either because they assume too much or because there is not a logical connection between the major premise and the conclusion. As a means of avoiding those perceived deficiencies, this opinion will start with basic foundation stones and build upon them.

## TRADE IN MEDIEVAL ENGLAND

Bankruptcy is an unfortunate but persistent concomitant of trade. Whenever trade advances above the simple barter level, credit will come into play, and credit will produce unpaid debts whenever borrowers meet financial misfortunes. Before discussing why bankruptcy law developed in its own peculiar manner in England and why it developed later there than on the Continent, it is worthwhile to establish a solid foundation of understanding of the economic climate in which this specialized branch of the law began to emerge.

Except for its participation in the Crusades, England was in a somewhat isolated position with respect to Western Europe through the thirteenth century, with a continuing balance toward rural life and cottage industry in comparison with what is now Italy, Germany, France and Belgium, which had begun their faltering movements toward an urban society and specialization in artisanship and manufacture. The rebellious attitude of the nobles toward the excesses of the kings which had produced the Magna Carta in 1215, continued under Henry III and Edward I, with a capitulation by the latter that taxes could be levied only by the consent of Parliament. During the thirteenth, fourteenth and fifteenth centuries the kings were anxious to expand the country's exports as a means of providing exchange to pay for its imports of glass, fabrics and finished metal, in particular. In an effort to promote maritime commerce Henry III created for the Hanseatic cities a corporation to encourage their citizens to settle in England, which was granted a patent for exclusive export shipping privileges, as well as other privileges and the exemption from heavy export duties paid by other aliens. Henry VIII revoked the patent some three hundred years later because the Easterlings had not developed an English merchant marine but continued to use their own ships.

## STAPLES

The principal device for the fostering of export trade was the establishment of staples, or designating cities or towns, or portions of cities or towns, as staples. In a broad sense a staple was a single purpose community devoted to trade, export trade in particular, but trading in general. Each staple had its own permanent administrative staff, headed by a mayor appointed by the king. Where the staple was within the geographical limits of a city or town there would be parallel administrations, each largely independent of the other.

---

Four courts held that Congress did not intend that section 522(f) be applied to pre-enactment liens. *See In re Malpeli*, 7 B.R. 508, 7 B.C.D. 249 (Bkrtcy.N.D.Ill.1980); *In re Pape*, 7 B.R. 443 (Bkrtcy.N.D.Fla.1980); *In re Pierce*, 4 B.R. 671, 6 B.C.D. 484 (Bkrtcy.W.D.Okla.1980); *In re Hyden*, 10 B.R. 21, 3 Collier 2d 751 (Bkrtcy. S.D.Oh.W.D.1980).

In at least one case a court has held that avoidance of a pre-enactment judicial lien is unconstitutional. *In re Ashe*, 10 B.R. 97 (Bkrtcy.M.D.Pa.1981).

7. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601–602, 55 S.Ct. 854, 855, 868–69, 75 L.Ed. 1593, 1611 (1935).

They are in good company. Professor Frank R. Kennedy of the University of Michigan Law School and Executive Director of the Bankruptcy Commission submitted prepared testimony with respect to Radford, "The Court held that the statute deprived mortgagees of their property without due process of law in violation of the Fifth Amendment, to which bankruptcy legislation is subject." *Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the Comm. on the House of Rep.*, 94th Cong., 1st Sess. 166 (1975) (statement of Frank R. Kennedy). [Hereinafter referred to as *"Hearings on H.R. 31 and H.R. 32"*].

In 1347, after a siege of one year, the English under Edward III captured Calais, from which all French persons were banished, and it was repopulated with English. From 1390–1558 it was the Chief Staple and for a period of time was the only place from which wool, very much in demand in Flanders and France, could be exported from England. It was also a staple for linen, tin and lead, as were a number of other cities and towns. Limiting exports to a small number of communities greatly simplified the collection of export duties, and the monopoly power which the staple merchants had in setting prices for the exported commodities produced great profits for them which in turn enabled them to become financiers of the king, which, in turn, permitted him to wage wars, build castles, and other expensive diversions without being dependent upon Parliament to provide revenues. The staple merchants thus became an effective counterweight which the king could use in his continuing struggle for power with the nobility.

During the period of Crusades the proscription against the charging of interest by Christians had caused the lending of money to be largely in the hands of the Jews.[8] In the reign of Edward I a shift developed, and the financing for the Crown and for the nobility came to be done primarily by citizens of Chiari in Lombardy and Asti in the Piedmont, who were referred to collectively as Lombards. A century later the merchants from Venice, Genoa and Naples and the financiers of Lucca and Florence still were referred to as Lombards.[9] After the banishment of the Jews from England in 1290, the Lombards became the financiers of the general public as well as of the king and the nobility.

The extent of the loans by the Lombards to the king are staggering to comprehend and probably equalled 25% or more of the revenues of the country.[10] Between 1272 and 1294 the Ricciardi family of Lucca lent Edward I £400,000.[11] The Frescobaldi family of Florence lent Edward I and Edward II £150,000 between 1296 and 1310. Edward I owed the Ricciardi family £27,000 and the Frescobaldi family £25,000 when he dropped them as his fiscal agents in 1295. The Peruzzi family lent Edward III £125,000 between 1338–39.[12] The interest rate which he paid is not known, but he paid the Bardi family 26% interest between 1328–1331. The Mirabello family charged Edward III 35% interest and took back the Great Crown of England as a pledge. Generally the loans were secured by a pledge of the excise taxes collected at the staples. When Edward III defaulted on his loans from the Bardi and Peruzzi families in 1340, it forced them into bankruptcy under Florentine law and their creditors were paid, respectively, 70% and 10%. From that point forward the Lombards were reluctant to finance the king, which caused him to develop a substitute source of money independent of Parliament. Future loans to the various kings by staple merchants were of the same magnitude as those described above. During the fourteenth through sixteenth centuries the four way power play which had existed among the Church, the Crown, the landed gentry and the merchants, gradually developed into a two way

8. For an explanation of the religious causes *see Matter of Michigan Avenue National Bank*, 2 B.R. 171, 174, 6 B.C.D. 1101, 1104 (Bkrtcy.N.D. Ill.1980).

9. Statute of Lombards, 1350, 25 Edw. III, c. 23.

10. B. Johnson, *The Politics of Money* (1970); *The Dawn of Modern Banking* (1979).

11. It is difficult to gain a proper perspective on monetary units. During much of the reign of Edward I, the annual wage of a laborer was about £1, 3s. There were intermittent periods of inflation for several centuries due in large part to reductions in the fine metal content of specie. During the reign of Edward I, this resulted from trimming the edges of the coins; during the reign of Henry VIII, it resulted from alloying base metals with the gold and silver.

The average annual wage for a laborer during the reign of Henry VIII was about £4, 3s., 3d. In 1523 he caused to be established ceiling prices of one-half penny per pound for beef and pork. Statute of Westminster, 1523, 24 Hen. VIII, c. 3.

12. This was in the range of the annual wages of 100,000 laborers. D. Hume, *History of England* (1864); J. Froude, *History of England* (1870).

struggle between the gentry and the merchants, although grade school primers may describe it as a struggle between the gentry and the king or between the common people and the nobility.

## STAPLE MERCHANTS

The most significant economic and social aspect of English development after the thirteenth century was the growth of the merchant class. The temptation to describe them as the upper-middle class has been avoided because within one or two generations of achieving their wealth they usually acquired landed estates which carried titles of prominence with them. A particular reason for this was that the kings tended not to repay in money the advances which had been made to them by staple merchants or other financiers but would grant additional monopolistic patents or give to the staple merchants lands which the Crown had appropriated from abbeys or monasteries. When Henry VIII suppressed some 300 monasteries with annual incomes of less than £200 [13] in 1536, he appropriated most of their lands unto himself, but when he suppressed some 645 major monasteries in 1538, most of the lands were given to merchants, with only lesser amounts being retained by the king and his favorites. Staple merchants, specializing in export trade, will be discussed before regular merchants, dealing in domestic trade, because the monopolistic profits available to them caused them to have a greater political influence with the king due to their greater ability to make payments by way of gifts, taxes, contributions, or whatever one wishes to call payments made by a person receiving political favors.

The primary legal basis for staples and staple merchants was the Statute of Staples, [14] which established the following principles:

1. that ten named staples in England, one in Wales and four in Ireland should have the exclusive right to export wool, sheepskins, leather and lead;

2. standards of weights and measures;

3. export duties in which the tax to English citizens was about 70% of that to aliens;

4. guaranties to foreign merchants that they would not be taxed other than the stated excise taxes on exports and that their disputes could be settled in the mercantile courts and not in the common law courts;

5. guaranties to foreign merchants that no English, Welsh or Irish merchants would do business at sea or overseas;

6. the king's officials and courts would have no cognizance within the staple;

7. that merchants could enter and leave the staple without any form of tax other than the excise tax on specified staple commodities destined for export;

8. disputes respecting land were to be settled at common law, as was punishment for felonies, with juries in trials of aliens to be composed of aliens;

9. the mayor could take recognizance of debts, imprison for debt, seize goods of the debtor and deliver them to the creditor, and execute upon land without the customary three-month grace period;

10. gold and silver could be brought into the country and taken out freely.

## MERCHANTS

Staple merchants are discussed here out of chronological sequence because of their great influence upon the kings and upon policy respecting trade and commerce. Ex-

---

13. This was about equal to the combined annual wages of twenty-eight artisans; using wages as the measuring stick, £200 in 1536 would equal about $700,000 today. 1536, 27 Hen. VIII, c.28.

14. De Stapulis, 1353, 27 Edw. III, stat. 2.

port was not the only concern of the Crown, and several important acts were passed which were designed to assure foreign merchants importing goods into England that they would be paid for their goods.

The Statute of Acton-Burnel [15] is of interest because it deals with nonpossessory liens on chattels. A procedure was established, probably derived from the Jewish Exchequer,[16] under which a selling merchant could bring a credit purchaser with him before the mayor, where jointly they would acknowledge the amount of the debt and the agreed payment date, which would be recorded. If the debt should not be paid at maturity, the mayor could cause the debtor's assets to be sold; if the debtor had no chattels, the mayor could cause him to be imprisoned. Guarantors of a note continued to be liable on it after a debtor's imprisonment, but recourse could not be taken against a guarantor until after the debtor's chattels had been sold.

The Statute of Merchants [17] differed from Acton-Burnel in that it was not necessary for the mayor to sell the debtor's chattels before causing an imprisonment. Guarantors of debts were subject to imprisonment and sale of their chattels in the same manner as the debtor. The lands of an heir were subject to the debts of his ancestors, but the heir could not be imprisoned for lack of payment. The act was not available to Jews, probably because they already had a counterpart for the registration of debt in the Jewish Exchequer. It is interesting that the lien of the registration became effective as of the registration date, so that the lands held by the debtor at the time of the recognizance were subject to it, in the same manner as recording statutes

which became common in America some five hundred years later.

The Statute of Merchants was the first law in England which permitted land to be taken for the satisfaction of debts, but that right was limited to merchants. In that same year the Statute of Elegit [18] permitted execution upon the goods or lands of debtors by creditors generally and is an example of an early exemption law in that it excepted from execution "only his Oxen and the Beasts of his Plough and the one half of his Land."

IMPRISONMENT FOR DEBT [19]

As an example of man's inhumanity to man, debtors prisons must rate high on the scale. In *Sturges v. Crowinshield*,[20] which will be discussed below, Chief Justice Marshall wrote,

"To punish honest insolvency, by imprisonment for life, and to make this a constitutional principle, would be an excess of inhumanity, which will not be imputed to the illustrious patriots who framed our constitution, nor to the people who adopted it."

The most dreadful feature of debtors prisons was that there was no termination of the imprisonment other than payment of the debt. The debtor's board was paid for by a creditor, but the amount of that payment plus a gaol charge was added to the debt, and there was no way by which an imprisoned debtor could earn money to reduce the debt. As a method of putting pressure upon the debtor's relatives and friends to pay his debts, the threat of prison undoubtedly was effective; to this Court it is appalling that debtors prisons continue to exist in the twentieth century.[21]

15. Statute of Acton-Burnel, 1283, 11 Edw. I.

16. *See Matter of Michigan Avenue National Bank*, 2 B.R. at 174.

17. De Mercatoribus, 1285, 13 Edw. I, stat. 3.

18. Statute of Elegit, 1285, 13 Edw. I, c. 18.

19. *See* Ford, *Imprisonment for Debt*, 25 Mich.L. Rev. 24–29 (1926); Note, *Present Status of Execution against the Body of the Judgment Debtor*, 42 Iowa L.Rev. 306 (1957).

20. 17 U.S. 120, 200 (4 Wheat. 120, 200), 4 L.Ed. 529 (1819).

21. In most parts of the civilized world imprisonment for debt has been abolished, but it still continues in such regions as Maine and Illinois. In Illinois, the limit of imprisonment is six months, and the debtor receives a credit of $1.50 per day against his debt. Ill.Rev.Stat. ch. 77, § 65 *et seq.*

Imprisonment for debt was a common law remedy available only to the successful plaintiff in an action for trespass *vi et armis*, which in the beginning was an action quasicriminal in nature used by injured parties to punish for misdemeanors. (Public prosecution for crimes less than felonies did not commence in England until the nineteenth century). Imprisonment was allowed as a remedy because of the Crown's abhorrence of the use of force. By various acts of Parliament imprisonment for debt was extended to misappropriations by bailiffs (1268), debts owed to foreign merchants (1283), misappropriations by various agents (1285), actions for debt and detinue (1351), debts owed to staple merchants (1353), action on the case (1504), and covenant (1532). Thus it was available generally as an enforcement medium or collection device prior to the first bankruptcy act (1542).

The process of imprisonment for debt was well described in the Statute of Acton-Burnel,[22] which provided that after non-payment of a registered debt the mayor could cause the debtor's movables to be sold. If the debtor had no movables, his body might be taken and kept in prison.

> "until that he have made Agreement, or his Friends for him; and if he have not wherewith he may sustain himself in Prison, the Creditor shall find him Bread and Water, to the end that he die not in Prison for Default of Sustenance, the which costs the Debtor shall recompense him with his Debt, before he be let out of Prison."

## AVOIDANCE OF PERSONAL SERVICE [23]

The form which Anglo-American bankruptcy statutes have followed from 1542 to 1978 is the result of early adherence to the fundamental principal of English jurisprudence that an *in personam* judgment could not be obtained against an individual unless he had been served personally. There were five methods commonly used in medieval England to avoid service:

1. Outlawry
2. Flight
3. Keeping house
4. Sanctuary
5. Imprisonment

Outlawry possibly is out of place in this list because it was descriptive of a public declaration made with respect to a person who had fled owing debts. All of his property became escheated to the king, and the outlaw no longer was entitled to any of the protections of the king's courts.

In the medieval period flight was the most common method by which persons avoided paying their debts, both in England and on the Continent.

In medieval England a man's house was his castle, and if a person remained within his own house and did not venture outside, he could not be served with process.

Traditionally a person could avoid service by taking sanctuary in a broad list of churches, abbeys, monasteries, or other religious institutions. The most widely used was Westminster, which is adjacent to London and was about one-fourth its size. A person taking sanctuary in such a place of privilege had considerable freedom of movement, but he was always in the company of felons who were taking sanctuary themselves. In the space of a few years Henry VIII closed some 950 abbeys and monasteries and shortly afterward caused the privileged status to be removed from others.

Collusive imprisonment for debt was a method by which a debtor would permit himself to be imprisoned by a friendly creditor so that he could avoid service of process by unfriendly creditors.

## BANKRUPTCY AND INSOLVENCY ACTS

For the purpose of making distinctions this opinion will use the terms, "bankruptcy act" and "insolvency act", in the sense that

---

22. Statute of Acton-Burnel, 1283, 11 Edw. I.

23. Treiman, *Escaping the Creditor in the Middle Ages*, 43 Brit.L.Q. 230 (1927).

they were used in England and in the American colonies prior to the adoption of the Constitution in 1789. A "bankruptcy act" is a statute the primary purpose of which is to enable multiple creditors to obtain an equitable distribution of the assets of a debtor. An "insolvency act" is a statute the primary purpose of which is to enable a debtor to avoid debtors prison, whether to be released from prison if already there or to avoid being imprisoned in the first instance. All other segments of law intended to provide assistance to delinquent debtors would be gathered under the catch-all phrase "debtor-relief laws", whether statutes of limitation, redemption periods, stay laws, exemption laws, appraisal laws, moratoria, limitations on garnishment and wage assignment, usury laws, prohibition of *cognovit* notes, and many others.[24]

Several important distinctions between bankruptcy law and insolvency law should be borne in mind as the development of the two is discussed. In terms of statutory law, bankruptcy stood alone from 1542 until 1660, although royal commissions after 1585 were empowered to provide release from prison for worthy indigents. Bankruptcy always has been a creditors' law, and it always was an involuntary proceeding brought by creditors until the middle nineteenth century when bankruptcy law and insolvency law largely merged together in America under the collective name of bankruptcy law.[25] Insolvency law, on the other hand, always was a debtor's law, and it always was a voluntary action brought by a debtor. It was administered in insolvency courts separate and apart from the bankruptcy courts, except that in rural America, both colonial and early statehood, the expense of dual courts was not always maintained.

## PRECURSORS OF BANKRUPTCY STATUTES

Three statutes which fail to meet the definition of bankruptcy acts because they do not necessarily require the existence of multiple creditors are of interest because of their central theme of taking sanctuary to avoid payment to creditors:

1. *Act of (1376), 50 Edw. III, c. 6.*
 Collusive gifts made by debtors who thereafter take sanctuary may be disregarded by creditors "as if no such gift had been made."

2. *Act of (1379), 2 Rich. II, 2 stat. c. 3.*
 Default judgment provided against a person taking sanctuary after making feigned gifts of goods or lands, to be satisfied out of such property or other property.

3. *Act of (1487), 3 Hen. VII, c. 4.*
 Deeds of gift in trust to defraud creditors by persons who go to sanctuary or other places privileged to be avoided.

The *Statute of Lombards,* (1350), 25 Edw. III, c. 23, had the same main theme in that if a Lombard took flight to avoid payment of a debt the entire Company of Lombards would be liable for the debt.

## AN ACT AGAINST SUCH PERSONS AS DO MAKE BANKRUPTS.

(1542–43), 34 and 35 Hen. VIII, c. 4.

The preamble of the first English bankruptcy act reads:

"Whereas divers and sundry persons craftily obtaining into their hands great substance of other mens goods, do suddenly flee to parts unknown or keep their houses, not minding to pay or restore to any their creditors their debts and duties, but at their own wills and pleasures consume the substance obtained by credit of other men, for their own pleasure and delicate living, against all reason, equity and good conscience."

---

**24.** Federal consumer protection efforts include consumer credit cost disclosure. *See* 15 U.S.C. §§ 1631–1671 (the Consumer Credit Protection Act). There are also limits upon the amount a creditor may garnish an individual debtor's wages. *See* 15 U.S.C. § 1673. *See also* The Truth-in-Lending Act, Title I of Pub.L.No.90–

321, 82 Stat. 146, 90th Cong., 2d Sess. (1968), 15 U.S.C. §§ 1601 *et seq.*

**25.** In England, they were combined under the name of bankruptcy by Act of Parliament in 1861.

No explanation can be found for the fact that the preamble listed only two of the four common methods in then current use by debtors to avoid their creditors. The second bankruptcy act ("an act touching orders for bankrupts") [(1570), 13 Eliz., c. 7] listed all four:

1. "at any time hereafter shall depart the realm",
2. "begin to keep his or her house, or houses, or otherwise absent him or herself",
3. "take sanctuary", or
4. "suffer him or herself willingly to be arrested for any debt or other thing."

No present purpose would be served by describing in detail the provisions of either act. The significant aspect is that these acts established the structure of bankruptcy law which continued in America until 1978, namely, that a jurisdictional requirement existed of there having been committed an act of bankruptcy. The format is somewhat more apparent in the Act of 13 Elizabeth because after listing the four methods of avoiding service the act continues:

"hath or will suffer him or herself to be outlawed, or yield him or herself to prison, or depart from his or her dwelling house or houses, to the intent or purpose to defraud or hinder any of his or her creditors, being also a subject-born, as is aforesaid, of the just debt or duty of such creditor or creditors, shaLl be reputed, deemed and taken for a bankrupt."

One other noteworthy feature of the Act of 13 Elizabeth is that it limited the objects of bankruptcy proceedings to:

"any merchant or other person, using or exercising the trade of merchandizing by way of bargaining, exchange, rechange, bartry, chevisance, or otherwise, in gross or by retail, or seeking his or her trade of living by buying and selling and being subject born of this realm, or of any of the Queen's Dominions . . ."

Among the reasons that bankruptcy statutes in England developed a century or more after those on the Continent were:

(a) shipping was conducted largely by Hanseatic persons, who settled their disputes in Hanseatic courts;
(b) artisans settled their disputes in the guildhalls, and
(c) merchants settled their disputes in the mercantile courts under the Law Merchant.

The proceedings in these other justicial bodies were not matters of record, so that we are not familiar with their methods. If any member of the classes listed above had a dispute with a debtor or creditor not a member of the same class, that dispute probably would have been brought into the common law courts.

We do not have legislative history which establishes why it was that the second bankruptcy act was limited to creditors who were merchants and traders, but there is little doubt that it was due to the control of Parliament by the nobility and the landed gentry. Farmer always have provided the sternest resistance to involuntary bankruptcy proceedings, and they continue to be exempt under the Code. (Their principal argument for exemption is that a perfectly sound farming operation may run into difficulty in making payments in a given year due to extreme weather conditions which are not likely to recur a second year). Merchants, traders and persons similarly engaged in foreign commerce continued to be the only persons subject to bankruptcy until the blending of bankruptcy law and insolvency law in the nineteenth century brought a similar blending of involuntary and voluntary proceedings.

The year 1566 is the year in which the balance between creditor and debtor can first be shown to begin to tip in favor of the debtor. That trend has continued ever since, and, for the time being at least, has peaked out with the Bankruptcy Reform Act of 1978. In 1566 an act of Queen Elizabeth [26] restricted considerably the causes for imprisonment for debt, and in 1585 she issued a proclamation authorizing a commission to look into the subject of

---

26. 1566, 8 Eliz., c. 2.

imprisonment for debt on a broad scale. Its rulings had the force of law, as did those of a similar commission established by James I, which continued to function until his death in 1625. The first act of Parliament designed to avoid imprisonment for debt was enacted in 1660 by the republican parliament after the execution of Charles I. The first general insolvency act was passed in 1683 and became the model for most of the colonial insolvency laws.

It would be futile to attempt to point out legal reasons for the four century trend toward an improved relative position for debtors. Similar social and economic advances by working class persons were being made concurrently in all of the other facets of their lives. The broadened exemptions and the lien avoidance powers of the Bankruptcy Code are to their debts the same as medicare, medicaid, food stamps, social security, unemployment insurance are to other aspects of their economic lives.

In a sense bankruptcy law is a microcosm of the changing relationship between property and humanity which has been evolving as a steady process since before the Industrial Revolution. Essentially it is Parliament or the Congress which has determined the direction and the distance to be covered in each advance. Under the American Constitution the function of the courts is limited to a review of the reasonableness of the legislative action.

### INSOLVENCY ACTS

It will be remembered that insolvency acts were defined as laws designed to avoid imprisonment for debt. About forty insolvency acts were passed in England between 1685 and the American Revolution. All of the American colonies except Connecticut had general insolvency laws; Connecticut passed a number of private laws each year. Only Pennsylvania and Rhode Island had bankruptcy laws, which were ineffective against citizens of other colonies who were not subject to service outside the colony where the proceeding was instituted. The first insolvency acts were designed to release from prison honest debtors whose entire assets already had been consumed in an earlier bankruptcy case. It was a short step from there to have laws which were designed to prevent incarceration. If bankruptcy had preceded, the situation was much as above. If there had been no bankruptcy, it was necessary in one way or another for the debtor to make an assignment of all of his assets, saving out only his exempt property, to a receiver who would distribute the assets among the creditors. The discharge granted in English insolvency proceedings, however, was not of the debt but of the liability for imprisonment for non-payment of the debt; an unsatisfied debt continued to be subject to satisfaction by other means. As stated above, the bankruptcy laws, and insolvency laws moved along in parallel until the United States Constitution was adopted, which placed the authority of the national government above that of the state governments.

No purpose would be served by examining in depth the hearings of the Constitutional Convention nor the early cases which interpreted the language of the Constitution.[27] Suffice it to say, the granting power of bankruptcy jurisdiction to the national government is Article 1, Section 8, clause 4:

"The Congress shall have power

(4) To establish ... uniform laws on the subject of bankruptcies throughout the United States."

The applicable constitutional limitation on the powers of the states lies in Article I, Section 10, clause 1:

"No state shall ... emit bills of credit; make anything but gold and silver coin a tender in payment of debts; pass any bill of attainder, ex post facto law or law impairing the obligation of contracts ..."

During the period from 1783 until 1789 the economies of most states were in turmoil, but particularly of the rural Southern states. They issued their own paper money, they caused land or commodities to be legal tender for the payment of debts, and they

27. Nadelman, *On the Origin of the Bankruptcy Clause*, 1 Am.J. of Legal His. 215–228 (1957).

passed stay laws which prevented secured creditors from obtaining enjoyment of their collateral. It was to prevent a recurrence of these events should a future recession arise that the Convention adopted this limiting clause. During the period from the creation of the United States until the adoption of the Bankruptcy Act of 1898, three national bankruptcy laws were enacted which had an aggregate life of thirteen years. During most of that time the several states had insolvency laws or bankruptcy laws in force. A number of gray areas existed in which it was not precisely clear what the effective force of the state laws might be, but the general opinion was that state laws might exist in the absence of a national law and also in conjunction with a national law,[28] but that the national law would control in the event of a conflict and that the state law would have no effect beyond the boundaries of the state[29] nor with respect to debts made prior to its adoption.[30]

By 1830 about one-half of the states had adopted constitutional provisions prohibiting imprisonment for debt, so that the principal purpose of insolvency laws no longer pertained. In one form or another laws which continued to be called bankruptcy laws and insolvency laws remained in effect and gradually became what would be referred to in modern legal parlance as exemption laws.

## AN ACT TO PREVENT FRAUDS FREQUENTLY COMMITTED BY BANKRUPTS

4 Anne, c. 17 (1705)

This statute provided jurisdiction over the debtor,

"after notice [of the formation of a bankruptcy commission] in writing shall be left at the place of the usual abode of such person or persons, and notice given in the gazette."

Its principal significance in bankruptcy law is that it is the first bankruptcy statute which discharged the debts of the debtor:

"That all and every person or persons so becoming bankrupt ... shall be discharged from all debts to him, her, or them due and owing at the time that he, she or they did become bankrupt."[31]

The act did contain one flaw which persisted in American bankruptcy law until 1970, namely, that although discharge was a defense to a separate action on the debt, there was nothing to prevent the creditor from bringing suit on the debt other than that he would be responsible, if he lost, for the debtor's costs.

## THE DEPRESSION[32]

An analysis of *Radford* without a description of the economic setting in which it was written either assumes a considerable historical knowledge on the part of the reader or requires the reader to accept the reasoning of the Court blindly and without an opportunity to test the assertions or conclusions of the Court. For those who experienced the Depression a portrait of it is unnecessary, for nobody but a child could forget it, but urban dwellers were not aware or may have forgotten about the

---

**28.** *Ogden v. Saunders*, 25 U.S. 212, 334 (12 Wheat. 213, 334), 6 L.Ed. 606 (1827).

**29.** *James v. Allen*, 1 U.S. 187 (1 Dall. 187), 1 L.Ed. 93 (Ct. of Com. Pleas of Phil. County 1786).

**30.** By comity, extraterritorial effect might be given to the laws of another state. *Miller v. Hall*, 1 U.S. 229 (1 Dall. 229), 1 L.Ed. 113 (Pa.Sup.Ct.1788); Williston, *The Effect of a National Bankruptcy Law Upon State Laws*, 22 Har.L.Rev. 547–63 (1909); C. Warren, Bankruptcy in United States History (1935).

**31.** The act excluded heavy gamblers, and, in addition to the discharge, provided that the

debtor might be paid 5% of the amount recovered up to a maximum of £200 if the creditors received a 40% dividend, otherwise a smaller discretionary amount might be paid.

The act of 1732, 5 Geo. II, c. 30, required the consent of 80% of the creditors in number and amount for a discharge to be granted. From that time until 1898, every act contained a continuing but progressively declining degree of creditor control over discharges.

**32.** D. Sherman, The Great Depression (1960); L. Chandler, America's Greatest Depression (1970).

plight of the farmers, and it was to that tragedy that the Frazier-Lemke Act, the subject of *Radford*, was addressed.

The prices of farm commodities peaked in the summer of 1917 and declined steadily until 1932, and the prices paid for farms declined correspondingly. As farmers became unable to pay their taxes, the rates on the remaining farms in a county were increased to maintain the predetermined revenue level. In 1932 an oat farmer might be getting 40 bushels per acre which he could sell for 2¢ per bushel, but his taxes might be $1.90 and mortgage interest $3.60, so that it would be costing him $4.70 per acre to raise the oats, without any allowance for seed, his own labor or feeding his horse. In 1932 it took 2.5 times as many bushels of corn to meet a dollar obligation as it had in 1929 and 2.7 times as many bushels of wheat. Wheat was left standing in the fields in Montana because the cost of harvesting it was more than it would bring at the market. The freight rates on lambs sent to packers in Middle Western markets were greater than the prices paid for the meat; an entire lamb would bring $1.00, but the freight rates were $1.10; hogs sold for 2½ cents per pound, butter for 10¢ per pound, and eggs for 7¢ per dozen. Entire herds of sheep were destroyed in the West by ranchers who could not afford to feed them but could not bear to see them starve. Fruit was left on the vines in California and on the trees in Oregon when the cost of picking it exceeded its market value.

Even if the farmers did not pay their taxes and rent or interest, the prices which they received for their farm produce was less than the cost of seed and labor. In 1932, 77% of the farm mortgages in Oklahoma were in default. In 1931–32, 25% of all farms in Iowa were foreclosed.[33] Many rural banks failed, taking with them the savings which the farmers might have used to tide themselves over. Insurance companies refused to lend money to policyholders in spite of the loan values which were a part of the insurance contract.

In many farm communities, violence broke out or was threatened whenever a farm foreclosure sale was held, and it was in this atmosphere that many states adopted moratorium statutes, or stay laws, designed to give the farmer a breathing spell of several years, during which time it was anticipated that the general economy would recover. All of these laws were retrospective, and not prospective, in the sense that it was recognized universally that mortgagees would not advance new money in the future unless they were assured of having an ability to foreclose in the event of default.

*Home Building & Loan Association v. Blaisdell*,[34] considered the Minnesota Mortgage Moratorium Law, with the majority opinion written by Chief Justice Hughes. The law provided in part that it should remain in effect "only during the continuance of the emergency and in no event beyond May 1, 1935"; it was approved April 18, 1933. Although the act was directed toward farm foreclosures, it was broad in its language and the real property at issue was a residential house and lot in Minneapolis.

The mortgage in question had been made August 1, 1928; the foreclosure sale was held May 2, 1932, and the redemption period would have expired May 2, 1933 if it had not been extended by the Moratorium Law. The law provided that the county district court could extend a period of redemption "for such additional time as the court may deem just and equitable" and that the court should determine a reasonable value of income or reasonable rental value and direct the mortgagor "to pay all or a reasonable part of such income or rental value." The court found that $40 per month was a reasonable value and directed the mortgagor to pay that amount.

An interesting feature of the case is that it was stay laws and appraisal laws, as well

---

**33.** Nationwide, 45% of the farm mortgages were in default by 1933, and the bottom of the Depression still lay ahead.

**34.** 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

as the issuance of paper money and making commodities or land legal tender for the payment of debt, during the period of 1783–89, which had caused the Constitutional Convention to make the specific prohibitions of Article I, Section 10 and the general prohibition against enacting a "law impairing the obligation of contracts."

In July, 1930, President Hoover authorized the Attorney General to undertake an exhaustive investigation into the bankruptcy system. The resulting report by the Solicitor General proposed a comprehensive revision of the Bankruptcy Act of 1898. This report was transmitted by the President to Congress in February, 1932, and in due course was introduced as the Hastings Bill. The bill was perceived as being a creditors' bill and died in committee. Subsequently bills with more limited objectives were proposed and passed. Section 73 was added, which was enabling legislation giving to the bankruptcy courts certain of the powers of the district courts. Section 74 related to compositions and extensions and because it was to be administered by the bankruptcy courts was expected to be more flexible and useful than Section 12 (subsequently replaced in 1938 by Chapter XI). Section 75 was similar in concept to Section 74 but was limited to farmers. These sections, together with Sections 76 and 77, were enacted March 3, 1933.

On June 28, 1934, the Frazier-Lemke Act was passed and added to the Bankruptcy Act as subsection(s) of Section 75. As a mechanical matter the procedures for relief authorized in Section 74 and 75 proved too cumbersome to provide prompt relief.

Section 75(s) was similar in many respects to the state moratorium laws which had been enacted in 1932 and earlier in 1933. Congress recognized that if it were to be permanent legislation, it would doom the creation of future mortgages because the prospective mortgagees would be unwilling to lend money if they recognized that there would be severe limitations upon their ability to foreclose on their collateral in the event of default.

■ Frazier-Lemke was not bankruptcy legislation because it did not deal with the equitable distribution of assets to creditors. It was not insolvency legislation because it did not deal with the avoidance of debtors prisons. It was not general legislation in the usual sense because it dealt with only a single class of creditor and debtor. It was not permanent legislation because by its own terms it would expire November 30, 1939. It was not a part of a broad legislative scheme respecting creditors and debtors, as were sections 73, 74, 75, 76 and 77. It was not the evolutionary result of bankruptcy commission and committee hearings and reports but was contrary to them. In short, it was a piece of emergency legislation designed to aid farmers which was appended to existing bankruptcy law. As a matter of structure in order to be effective it had to be appended to some federal power which exercised supremacy over state powers because the purpose of it was to override state laws relating to mortgages and foreclosure of mortgage in default. Although states are prohibited from "impairing the obligation of contracts", the federal government is not.

## RETROACTIVITY

■ A number of the briefs of the proponents of unconstitutionality contained arguments about retroactivity, *ex post facto* laws, and impairment of the obligation of contracts. Each of these phrases arouses patriotic emotions among all who attend, but they have little or nothing to do with the cases before this Court. The constitutional restrictions against *ex post facto* laws relate to criminal activities; those against impairment of contracts relate to state laws. With respect to the arguments about *ex post facto* laws we will quote Chief Justice Marshall and proceed to matters of legal significance:

"So much of this prohibition as restrains the power of the states to punish offenders in criminal cases, the prohibition to pass bills of attainder and *ex post facto* laws, is, in its very terms, confined to pre-existing cases. A bill of attainder

can be only for crimes already committed; and a law is not *ex post facto*, unless it looks to an act done before its passage. Language is incapable of expressing, in plainer terms, that the mind of the convention was directed to retroactive legislation." [35]

Retroactivity consists of *nunc pro tunc* changing the nature of a deed in the past. The most common civil usage of retroactive legislation is the avoidance of fraudulent transfers; things which were done are treated as though they had not been done. Under the heading *Precursors of Bankruptcy Statutes*, this opinion listed statutes of 1376 and 1487 which treated transfers made as though they had not been made. Bankruptcy acts have treated transfers in fraud of creditors in that same manner for centuries, and preferential or collusive transfers have been treated in the same way. Retroactively the transfer is negated.

The language of the first bankruptcy act [34 and 35 Hen. VIII, c. 4 (1542 and 3)] strongly suggests that the act of bankruptcy should follow the enactment of the statute and apply to debts existing at the time of the bankruptcy proceeding, whenever they were incurred. The second bankruptcy act is somewhat more explicit:

> "That if any merchant ... since the first day of the present parliament hath, or at any time hereafter shall depart in the realm ... shall be reputed, deemed and taken for a bankrupt."

Even though bankruptcy was a quasi-criminal act, the statute was retroactive to an extent because the act of bankruptcy might have preceded the enactment of the law by a period of months. There was no question that the act related to all of the assets which the debtor held, whether he acquired them before or after the passage of the act. The distribution was to achieve:

> "true satisfaction and payment of said creditors; that is to say, to every of said creditors a portion, rate and rate like, according to the quantity of his or their debts."

If pre-enactment creditors were to have been treated differently from post-enactment creditors, it would have been necessary to have provided for it.

Retroactive may be used in several senses and frequently is. *Holt v. Henley* [36] did not use the term but it represents an example of the issue of whether a law should relate back to conditions prior to its enactment. By an amendment to the Bankruptcy Act passed June 25, 1910, a trustee in bankruptcy had the rights of a lien creditor as of the date of the filing of the petition. On November 23, 1909, a valid mortgage had been executed, but it never was recorded. The Supreme Court interpreted the intent of Congress to be that the statute should not affect property rights existing at the date of its passage. Consequently, the theoretical lien of the trustee would not impair property interests which existed at the date of the enactment of the statute. The other sense in which retroactive is used is with reference to preferences and fraudulent transfers, which a trustee in bankruptcy has an opportunity to avoid by causing to be set aside after the fact of the transfer.

Retrospective will support a somewhat better argument than retroactive, but it still falls short. Recent statutes present the situation most distinctly. Section 77 was added to the Bankruptcy Act of 1898 in 1933, which was a year in which $300,000,000 in railroad debt was to mature. Many of the debt issues provided that a default in payment of interest or principal would cause not only the entire amount of that issue to become due but the entire amount of any senior issue also. As a matter of economics it was clear that a number of railroads would default and because of interline agreements would bring other railroads down with them. There cannot be any question that Section 77 was intended to relate to pre-enactment debt; probably all of the debt in every railroad reorganization, other than equipment trust issues and small amounts of current borrowings, rep-

35. *Ogden v. Saunders*, 25 U.S. at 212, 12 Wheat. 213 (Marshall, C. J., dissenting).

36. 232 U.S. 637, 34 S.Ct. 459, 58 L.Ed. 767 (1914).

resented pre-enactment debt. The chances are long that 90% of it was debt created before 1928. Many of the bonds were very long term, ninety-nine years or perpetual. Many of the leases had nine hundred ninety-nine year terms. The probabilities are that 90% of the debt administered under Section 77B [37] was created before 1930.

Those attorneys who take the position that bankruptcy statutes are to operate prospectively only have not looked at the real world. Let us suppose that the Bankruptcy Code had not been intended to affect pre-enactment debt. The Courts could have gone on a one-day week for two years because it would have taken two years for most persons to accumulate sufficient debt to make it worthwhile for a debtor to have it discharged or compromised.

■ All bankruptcy acts deal with debt which exists at the time of the filing of the bankruptcy petition, whether or not the debt was created prior to the enactment of the statute. If that were not so, one or more post-effective creditors could initiate an involuntary proceeding in which they would be the sole distributees. The debts due to the pre-enactment creditors would not be discharged, but there would be no assets remaining through which they might hope to receive a partial distribution after the post-effective creditors had been paid in full.

The Act of 1800 was adopted to rectify the debts arising from the Panic of 1797; the Act of 1841 to settle the issues of the Panic of 1837; the Act of 1867 to solve the problems arising from the Civil War; and the Act of 1898 to resolve disputes resulting from the Panic of 1893; the legislation in the Thirties to deal with debts created for the most part prior to 1929. It is so clear that the Bankruptcy Code, like all of its predecessors, was intended to deal with existing debts no matter when created that further discussion would be a waste of paper.

■ To a degree the problem which the attorneys are having with retroactivity appears to be derived from their failure to differentiate between federal and state powers in the bankruptcy area. The states may not impair the obligation of contracts, which means that a state bankruptcy statute may not affect pre-enactment debts. Because the Act of 1898 and the Bankruptcy Code are so broad it would appear unlikely that there is any area in which a state bankruptcy act could operate without being in conflict with the national law, but if there is such an area and if there is such an act, that act can alter only debts which arose after its own adoption.

■ It is in the nature of a bankruptcy act to alter contracts because that is its purpose. The debtor has promised to pay 100% and is unable to do so. The bankruptcy act tells the creditors that they are going to have to settle for whatever the debtor has. The bankruptcy act has caused all of the creditors' contracts with the debtor to be impaired. The briefs discussing impairment of contracts have been as big a waste of words as have those dealing with retroactivity.

## CONSTITUTIONAL PRECEDENTS

There are four United States Supreme Court cases,[38] all decided in the middle to

---

**37.** Section 77B was adopted June 7, 1934, and is the legislative progenitor of Chapters X, XI and XII of the Chandler Act, as well as Chapter 11 of the Code. It was limited to corporate debtors; "indubitable equivalence" is a description of the "cram down" requirement of section 77B(b)(5) from *In re Murel Holding Co.*, 75 F.2d 941, 942 (2d Cir. 1935).

**38.** *Home Building and Loan Assoc. v. Blaisdell*, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 855, 75 L.Ed. 1593

(1935); *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490, *reh. den.* 305 U.S. 668, 59 S.Ct. 56, 83 L.Ed. 434 (1940); *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), *reh. den.* 312 U.S. 711, 61 S.Ct. 445, 85 L.Ed. 1142 (1941). (The last two cases listed are actually the same case which went up twice before the Court). *See also* *John Hancock Mut. Life Ins. Co. v. Bartels*, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176 (1939).

late 1930's, which may be considered as useful precedents in dealing with the question of the constitutionality of § 522(f). These four cases have relatively simple facts and are convenient for comparative purposes because essentially each deals with a single debtor and a single creditor. The views expressed in *Continental Illinois National Bank v. Chicago, Rock Island & Pacific Ry. Co.*,[39] on the other hand, are persuasive but the facts are complex and the principal issue is the relative rights of various classes of creditors. The four cases present interpretations of five clauses of the United States Constitution:

1. *Bankruptcy Power*, Art. I, Sec. 8, cl. (4)

"The Congress shall have power:

(4) To establish . . . uniform laws on the subject of bankruptcies throughout the United States."

2. *Limitation on States*, Art. I, Sec. 10, cl. (1)

"No State shall . . . pass any . . . law impairing the obligation of contracts . . ."

3. *Supremacy*, Art. VI, Sec. (2)

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; . . . shall be the supreme law of the land;"

4. *Due Process*, Fifth Amendment

"No person . . . shall be deprived of . . . property, without due process of law;"

5. *Just Compensation*, Fifth Amendment

". . . nor shall private property be taken for public use, without just compensation."

The Constitutional issues respecting the bankruptcy power of the Congress and the supremacy of the laws of the United States in the bankruptcy area had been fairly well established by *Sturges v. Crowinshield* (1819) and *Ogden v. Saunders*, (1827), so that those subjects were points of departure rather than litigated issues in the 1930's. The four cases referred to all represented

the question of the efficacy of an emergency stay law to impede the completion of a mortgage foreclosure proceeding based upon a defaulted mortgage which existed at the time of the adoption of the stay law. *Radford* treated the issue as one of public taking without just compensation and held the original Frazier-Lemke Act unconstitutional. The two *Wright* cases, which will be referred to as *Vinton Branch* and *Union Central* to facilitate differentiation, treated the issue as one of deprivation of property without due process of law and held the second Frazier-Lemke Act constitutional. *Blaisdell* considered both the issue of impairment of the obligation of contracts and the issue of deprivation of property without due process of law and held the Minnesota Mortgage Moratorium Law constitutional. In this opinion we do not have to consider the state law issue of impairment because the statute under scrutiny is a federal statute.

Broadly speaking, the facts in all four cases are substantially the same; an individual landowner of property mortgaged before the Depression had defaulted on his mortgage and to prevent the commencement of, or the completion of, a foreclosure sale had attempted to take advantage of a stay law enacted after the default. In recent cases which have held § 522(f) to be unconstitutional, virtually all of them have relied on *Radford* but not for the reasons stated in that opinion.

*Radford* held that the original Frazier-Lemke Act was unconstitutional because it authorized the taking of private property without just compensation, namely, the foreclosure rights of which individual mortgagees had been deprived because of a national economic emergency were of sufficient substance so that a law which did not provide that the owners be recompensed was unconstitutional. That decision gave the Congress two choices; it could pass another law which would provide that the government should recompense the mortgagees, or it could pass another law which placed lesser restraints upon the mortga-

---

**39.** 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

gees. The Congress chose to do the latter, and the probabilities are that *Radford* would have been ignored generally afterward if *Vinton Branch*, which held that the revised Frazier-Lemke Act was constitutional on an analysis based upon the due process clause, had not cited *Radford* to support its due process reasoning. Mr. Justice Brandeis wrote both opinions, which has produced the anomalous result that there is cited in *Vinton Branch* as one of the leading due process cases a decision which did not even mention due process.

## LOUISVILLE JOINT STOCK LAND BANK v. RADFORD

In 1922 and 1924 Radford had mortgaged a farm with a presumed value of $18,000 to secure loans of $9,000 to be paid over 34 years. In 1931 and subsequent years the Radfords defaulted on the payment of taxes; in 1932 and 1933 they defaulted on their principal and interest payments, and in 1933 they defaulted on their obligation to keep the buildings insured. The Bank commenced a foreclosure proceeding in June, 1933 in which it requested the appointment of a receiver to take possession and control of the premises and to collect the rents and the profits. Radford then filed a petition for a composition under § 75 but failed to obtain the requisite consents. On August 6, 1934 and November 10, 1934, Radford filed petitions under § 75(s) (the Frazier-Lemke Act, amendment of June 28, 1934).

Paragraph 3 of subsection (s) provided for a long term purchase by the mortgagor at the appraised value if the mortgagee assents. The property was appraised for $4,445, but the mortgagee would not assent to the terms of the statute.

Paragraph 7 of subsection (s) provided for a five year stay of proceedings during which the debtor might retain possession and should pay a reasonable rental. The rental was fixed by the referee at $325 per year. The Bank offered to bid $9,205.09 in cash for the property, which money would have been paid back immediately to the Bank to retire the mortgage. As we read the court's interpretation of Kentucky law,

the Bank would have been entitled to possession of the farm if the foreclosure had not been stayed by the § 75 proceeding, which stay continued after the petition was amended to obtain relief under § 75(s).

The Supreme Court found that the Bank had been deprived of five property rights:

"1. The right to retain the lien until the indebtedness is paid.

2. The right to realize upon the security by a judicial public sale.

3. The right to determine when such sale shall be held, subject only to the discretion of the Court.

4. The right to protect its interest in the property by bidding at such sale whenever held . . .

5. The right to control meanwhile the property during the period of default, subject only to the discretion of the court. . ."

The principal distinction which the Court appeared to make between the Minnesota moratorium law approved in *Blaisdell* and § 75(s) was that the Minnesota stay was for a maximum of two years and could be shortened by the Court. Under the Frazier-Lemke Act the farmer's option to purchase extended for five years after the filing under § 75, and the filing might be made until March 3, 1938. Thus the unfettered option of the farmer to purchase might extend many years beyond the termination of the emergency.

It is interesting that the Supreme Court viewed the Fifth Amendment question presented there under the clause, "nor shall private property be taken for public use, without just compensation" rather than the clause, "no person shall . . . be deprived of . . . property, without due process of law." Radford states:

"The province of the Court is limited to deciding whether the Frazier-Lemke Act as applied has taken from the Bank without compensation, and given to Radford, rights in specific property which are of <u>substantial value</u>. [Underscoring supplied; citations omitted]. As we conclude that the Act as applied has done so, we

must hold it void. For the Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain, so that through taxation, the burden of the relief afforded in the public interest may be borne by the public."

The Supreme Court did not view the constitutional question as being whether the economic loss should be borne by the creditor or by the debtor, nor whether causing the loss to be borne by the creditor would be a "deprivation of property without due process of law." The Supreme Court considered the issue to be whether the cost of correcting a public economic crisis should be borne by individual mortgagees or by the public and whether causing the cost to be borne by individual mortgagees would cause "private property [to] be taken for public use, without just compensation." The Court held that it was a public taking without just compensation and consequently was unconstitutional.

That issue is not before us. § 522(f) does not attempt to correct a national crisis on an emergency basis. It deals with only a small portion of the total population; it deals with only a small portion of the credit industry; in each specific instance it deals with property of no or only nominal, value. Very obviously, no property has been taken for public use; a fortiori, no "rights in specific property which are of substantial value."

The *Radford* case has no application to the issues before this Court. The probabilities are that it will have only limited application in the future, although situations similar to *Armstrong v. United States*,[40] may arise from time to time. That case related to shipbuilding materials which had been assembled by Rice Shipbuilding Corporation for the construction of Navy personnel boats. Rice defaulted on the contract, and the government removed all of the materials to shipyards in other states. Under Maine law the suppliers to Rice had a materials lien similar to mechanics liens in many states. The government's defense was that mechanics liens cannot apply to "public work", but the Court held that the shipbuilding did not constitute "public work" because ownership of the boats would not pass to the government until the boats should be completed. Therefore, the liens attached and avoidance of them would constitute a taking of private property for public use without just compensation, citing *Radford*.

The emphasis upon property of substantial value in the *Radford* case suggests that the Supreme Court might be considering a *de minimis* doctrine in the field of public taking. If this should be so, it would appear to be equally applicable to a private lien termination proceeding. If there should be a *de minimis* doctrine, it would appear that in a vast majority of the non-possessory nonpurchase-money loans secured by previously owned furniture, the value of the furniture security would be significantly less than the court costs of collecting it, not to mention other collection costs.

Treating the stay aspect of the Frazier-Lemke Act as a matter of eminent domain fit into the economic, political and social atmosphere of the times because in county seats all across the country conditions approached anarchy when public foreclosure sales were held. A device which helped maintain the peace evolved, under which a designated farmer bid $1 for the foreclosed farm, and it was made absolutely clear to all in attendance, including the agent of the mortgagee, that anybody who bid more than $1 was in deep trouble. The winning purchaser then would give the farm back to the mortgagor.[41]

---

40. 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

41. Mortgagees soon came to realize that they would be in a better financial position to hold a defaulted mortgage which might be refinanced

Conceptually, eminent domain did not describe properly the relationship between the mortgagee and the government. Although something of substantial value had been extracted from the mortgagee, it was not transferred to the government. The government got peace, which is what it sought, but it did not get what the mortgagee had given up. Thus the eminent domain approach was contrary to an established body of law on what constitutes "taking" under the Fifth Amendment.

In *Vinton Branch*, discussed below, an opinion also written by Mr. Justice Brandeis, the Supreme Court began to back away from the entire *Radford* decision, but in a way which made it impossible to state that any one factor in *Radford* had been decisive of the issue of constitutionality. It seems as though the court might have been taking tentative steps toward the creation of a new constitutional yardstick by combining the two last clauses of the Fifth Amendment into a hybrid which would read, "No person shall be deprived of property without just compensation." That idea fit what the Court had thought was wrong with the original Frazier-Lemke Act. In an effort to temporize through the worst economic disaster which the nation had ever faced, the Congress had put the burden of the cost of the readjustment period on individual mortgagees rather than spreading it among the general public, as the Court felt was required.

Within three months after the original Frazier-Lemke Act was held to be unconstitutional, Congress adopted a new Frazier-Lemke Act, also designated subsection (s) to § 75 of the Bankruptcy Act, approved August 28, 1935. The new subsection (s) was considered by the Supreme Court in *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke*. Wright had mortgaged his farm in 1929. In March, 1935 he filed a petition under § 75 and on July 27, 1935 made a proposal for a composition which was not accepted by the mortgagee. On

October 8, 1935, Wright filed an amended petition under § 75(s). His petition was dismissed several months later, and the dismissal was appealed.

Among the differences between the original Frazier-Lemke Act and the new Frazier-Lemke Act were shortening of stay periods from five years to three, providing for more realistic appraisals, limiting the effectiveness of the act to the duration of the emergency, but primarily keeping matters within the discretion of the Court as to duration of the stay or determination that the emergency had ended. Mr. Justice Brandeis wrote the opinion in *Vinton Branch*, just as he had in the *Radford* case some two years before. It is interesting that in the *Vinton Branch* case he stated that the Fifth Amendment issue in the *Radford* case had been deprivation of property without due process of law, whereas that had not even been mentioned in the actual decision:

> "The opinion enumerates five important substantive rights in specific property which had been taken. It was not held that the deprivation of any one of these rights would have rendered the Act invalid, but that the effect of the statute in its entirety was to deprive the mortgagee of his property without due process of law."

Several years after *Vinton Branch*, another § 75(s) case reached the Supreme Court, *Wright v. Union Central Life Insurance Co.*, in fact it came up twice. The first opinion was written by Mr. Justice Reed, and the second opinion by Mr. Justice Douglas.

The Wrights owned two tracts of farm land in Indiana, both mortgaged in 1925. The only farm which raised questions which advance the present argument was the 200 acre farm which was mortgaged to secure a $9,000 note. From that tract in 1931 the Wrights conveyed 40 acre tracts each to their daughter-in-law, their daughter, and

---

later than they would be to have the mortgage lien eliminated by the payment of one dollar. Thus, the number of foreclosures by solvent mortgagees declined, but receivers of defunct

banks and insurance companies had no choice except to pursue reasonably prompt liquidation.

their son-in-law, who did not assume the mortgage; the Wrights retained the remaining 80 acres.

On October 29, 1934, Wright filed a petition for a composition under § 75 of the Bankruptcy Act, scheduling the 80 acres; on December 19, 1934 he amended his petition under § 75(s) (the first Frazier-Lemke Act), asking to be adjudged a bankrupt. On April 13, 1935, the daughter-in-law, daughter and son-in-law quitclaimed to Wright the property which he had deeded to them in 1931. On May 27, 1935, the mortgagee obtained a judgment on the note and a decree of foreclosure and bought the property at a foreclosure sale on July 20, 1935, receiving a certificate of sale from the sheriff. On October 11, 1935 Wright amended his petition under the new § 75(s) [revised Frazier-Lemke Act].

On July 20, 1936, the one-year period of redemption expired and the sheriff issued a final deed. On July 29, 1936 the mortgagee moved to strike from the schedules filed in the § 75 proceeding the 200 acres scheduled there, which was granted by the District Court and affirmed by the Court of Appeals. [With respect to the 80 acres which Wright had retained throughout, these orders appear to be incorrect on their faces]. The Supreme Court noted that two events had taken place between the sale on July 20, 1935 and the expiration of the redemption period on July 20, 1936; Congress had adopted a new § 75(s) to replace the § 75(s) held unconstitutional in *Radford*, and on October 11, 1935 Wright had filed a second amendment to his petition seeking to be adjudged a bankrupt under the new § 75(s).

Much of the opinion is technical and raises the issue of whether the property which was the subject of the bankruptcy proceeding was the property which Wright held at the date of the initial filing (80 acres) or the property which he held at the time that he filed the amended petition under the revised § 75(s) (200 acres). The Court held that the proper "line of cleavage" would be

the later date, which was when he sought an adjudication. Some of the language of the opinion may prove helpful in appraising the extent to which the Supreme Court feels that Congress may go in adjusting for the benefit of a debtor contractual arrangements which he had made previously with his creditor.

"The development of bankruptcy legislation has been towards relieving the honest debtor from oppressive indebtedness and permitting him to start afresh. [Citations omitted]. By the Act of March 3, 1933 . . . the Congress deliberately undertook the rehabilitation of the debtor as well as his discharge from indebtedness. This legislation has been held within the subject of bankruptcies . . . The debtor has a right of redemption of which the purchaser is advised, and until that right of redemption expires the rights of the purchaser are subject to the power of the Congress over the relationship of debtor and creditor and its power to legislate for the rehabilitation of the debtor . . . We think the provision for the extension of the period of redemption comes clearly within the power of the Congress under the bankruptcy clause . . ."[42]

The mortgage contract was made subject to constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between petitioner and respondent. 'Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order' [quoting *Blaisdell*].[43]

We have held that section 75(s) does not unconstitutionally affect the rights of the mortgagee. We do not think the provision for extension of the period of redemption in section 75(n) is invalid . . .[44]

---

**42.** 304 U.S. at 514, 58 S.Ct. at 1032.

**43.** *Id.* at 516, 58 S.Ct. at 1033.

**44.** *Id.*

"A court of bankruptcy may affect the interests of lienholders in many ways... [45]

"Such action does not indicate a disregard of the property rights created by state law. The state law still establishes the norm to which Congress must substantially adhere; a serious departure from this norm; i. e., from the quality of the property rights created by the state courts has led to condemnation of the federal action as constituting a deprivation of property without due process." [Citing *Radford*].[46]

The second *Union Central* case went somewhat farther in defining the limitations on the rights of the creditor and established that the creditor did not have the right to have the property sold at public sale until after the debtor had had an opportunity to purchase it at its appraised value.

"This Act provided a procedure to effectuate a broad program of rehabilitation of distressed farmers faced with the disaster of forced sales and an oppressive burden of debt. [Citations omitted]. Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. [Citations omitted]. There is no constitutional claim of the creditor to more than that. And so long as that right is protected the creditor certainly is in no position to insist that doubts or ambiguities in the Act be resolved in its favor and against the debtor. Rather, the Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, [citations omitted] lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and the letter of the Act." [47]

Thus, as we approach the adoption of the Bankruptcy Code, the limitation on the power of the Congress to adjust retrospectively the contractual arrangements which a debtor has made with a secured creditor is that the secured creditor may not be deprived of the value of his security, although he may be delayed in enjoying the use of it. Consequently, the issue before us as a broad generality is what, if any, is the value of the collateral. If there is no value, there is nothing to protect. If there is nominal value, a judgment decision has to be made. If there is high value, there remains the question of whether the Congress would have intended substantial rights of a creditor to be cut off, considering the 1930's cases which have not been challenged seriously since then. Finally, if Congress had intended to cut off isolated mortgagees with highly valued collateral in order that all mortgagors might have been treated under a set standard, would that have constituted an unconstitutional deprivation of the property of those isolated, scattered mortgagees?

## BACKGROUND OF BANKRUPTCY CODE

The bankruptcy legislation which culminated on November 6, 1978, with the signing by the President of the Bankruptcy Reform Act of 1978 began with the establishment of the Commission on the Bankruptcy Laws of the United States, effective July 24, 1970.[48] On July 30, 1973 the Commission filed its report with the President, the Congress and the Chief Justice of the United States. The report included a proposed new bankruptcy law and an explanation of the reasons for the proposals. This description of the report will be limited to those aspects which have a direct bearing on Section 522(f) of the Code.

One of the findings of the Commission was that the 1970 legislation amending § 17 of the Bankruptcy Act to cause questions of dischargeability to be heard in the bankruptcy courts had tended to discourage post-discharge harassment by creditors but also that the creditors

---

**45.** *Id.* at 517, 58 S.Ct. at 1033.

**46.** *Id.*

**47.** 311 U.S. at 278, 61 S.Ct. at 199.

**48.** Pub.L.No.91–354, 84 Stat. 468 (1970).

"continue to make advantageous use of the financial statements obtained at the time of extending credit by filing or threatening to file applications for determination of non-dischargeability against bankrupts and accepting reaffirmation in settlement of the litigation or threatened litigation." [49]

Among the recommendations of the Commission were the following:

"(6) A debtor be allowed to redeem collateral securing a dischargeable consumer debt by paying its appraised value if less than the amount of its debt.

(7) A discharge be given the effect of extinguishing a debt so that the debt may not thereafter serve as the basis for an enforceable obligation or judgment as a result of a mere 'reaffirmation'.

(8) The use of false financial statement be eliminated as a basis for excepting a consumer debt from the effect of a discharge." [50]

As a matter of rehabilitation philosophy, "The reaffirmation of agreements to pay debts, as distinguished from voluntary repayment of their debts, should be prohibited, and creditors should be restrained from interfering with the performance of a payment plan." [51]

"The Commission is also of the opinion that nonpurchase-money security interests should not be enforceable as to items of property essential to a debtor's well-being, such as wearing apparel, which are of little or no value to a creditor, other than as a means of coercing payment." [52]

"Under the present Act, creditors are able to frustrate the discharge by obtaining reaffirmations. Often reaffirmations are obtained by improper means, such as peer pressure, threat of criminal prosecution, and employer coercion. The Commission is of the opinion that the goal of rehabilitation should not be so easily frustrated. Therefore, the Commission recommends that reaffirmations not be enforceable and that the bankruptcy court be given jurisdiction of all disputes concerning the discharge." [53]

"What is often an unknowing or uninformed surrender of exemption rights should no longer be countenanced under the federal bankruptcy law. And in recognition of the possibility that creditors will simply obtain security, both as to existing and after-acquired assets, rather than rely on waivers, the Commission recommends that nonpurchase-money security interests in wearing apparel, household goods, and health aids be unenforceable against property allowed to the debtor as exempt. It does not seem advisable to the Commission to further restrict the enforceability of security interests, since this will impair the ability of a debtor to obtain financing without a substantial corresponding benefit to the debtor." [54]

"To further the rehabilitative goal of the discharge, the Commission recommends that an individual debtor be allowed to redeem property abandoned to or set aside to the debtor as exempt, which secures a dischargeable consumer debt, on payment of the fair market value of the property or the amount of the debt, if less." [55]

§ 4–506 of the Commission Bill [56] was somewhat like § 17(a)(2) of the Bankruptcy Act except that consumer debts were dischargeable even if obtained by fraud. The reason for this was not that the Commission favored fraud, but rather than it felt that

**49.** *Rep. of the Comm. on the Bankruptcy Laws of the United States*, H.R.Doc.No.93–137, 93rd Cong., 1st Sess. 11 (Part I) Comm. Print 1973. [Hereinafter referred to as the "Commission Report"].

**50.** *Id.*, at 11–12.

**51.** *Id.*, at 80.

**52.** *Id.*, at 169.

**53.** *Id.*

**54.** *Id.*, at 173.

**55.** *Id.*

**56.** *Commission Report, supra*, note 51 at 136 (Part II).

consumer debtors were being trapped by the loan companies at the time that application for loans were filed. Customarily the consumer filled out a personal financial statement or signed a personal financial statement prepared for him by somebody else. The consumer would be told to list his major debts, or his principal secured debts, or some other classification which was less than all, after which he would write or print in his own handwriting, "These are all of my debts." Upon his subsequent filing of bankruptcy, his petition would disclose that he had had other unlisted debts at the time of the preparation of his financial statement and, unless a reaffirmation agreement was signed, the creditor would file a complaint, or threaten to do so, contesting the dischargeability of the debt because of obtaining money on a materially false financial statement.

The Bankruptcy Commission relied rather extensively upon reports made by other institutions, particularly, The Brookings Institution. Among the findings of the Brookings Report [57] were that 41% of the discharged bankrupts interviewed reported that they had been subjected to postbankruptcy collection efforts. 38% of those who had been harassed said it was from loan companies, 11% from furniture stores; 12% of those harassed paid their bills in spite of their discharges. More than one-third of those interviewed reaffirmed some part of their debts; five-eighths of the reaffirmations were with loan companies. The collateral which secured the reaffirmed debts was appliances or furniture in 48% of the cases and automobiles in 30%. The central theme of the Bankruptcy Commission was to produce a discharge system which would permit discharged debtors to commerce economic lives which were unfettered by their past deficiencies. The Commission was particularly anxious to develop a process which would enable debtors, once discharged, to avoid the prospect of a second set of creditor problems, whether garnishment, wage assignment, composition, extension or bankruptcy. The Commission report outlined both procedural and substantive steps to avoid the regressions about which it was so concerned.

The procedural steps centered about a bankruptcy bureau which would deal with the administrative facets of bankruptcy. This was in recognition of two fundamental aspects of consumer bankruptcy:

1. Most consumer bankrupts are not sophisticated in money matters, and

2. Most consumer bankrupts do not have any assets to distribute among creditors, and it is a time consuming and expensive process to have their cases administered under a procedure which is geared toward handling asset cases.

In addition to a simplified method of processing the cases, the bureau would provide economic counselling.

The substantive steps centered about permitting the discharged debtor to begin a new economic life free. There were some practical limitations on this goal. Possibly 10% of the consumer debtors were purchasing homes through real estate contracts or mortgage financing. These markets would have been closed to the debtors in the future if any law with prospective application had encumbered the rights of the real estate creditors to foreclose upon their collateral. Possibly 75% of the consumer debtors furnished their homes or apartments with furniture and appliances which had been acquired from retailers on an installment contract basis or had been financed by consumer loans which had been supported by security interests in the household goods acquired. In the future those markets would have been closed to future prospective home buyers if the creditors had not been able to look to their collateral as a source of funds in the event of default. Possibly 85% of the consumer debtors who owned relatively new motor vehicles had acquired them in the same manner as the

**57.** D. Stanley, M. Girth, Bankruptcy: Problem, Process, Reform (1971), referred to as the "Brookings Report."

household goods just described, and the ability of prospective consumers to do so in the future was a product of the same economic reality.

With respect to security interests for consumer loans which did not represent purchase money collateral the Commission found an entirely different situation. From the standpoint of the lender, the collateral, other than automobiles, had little or no commercial value. Frequently it had a negative value because the cost of picking up the household items and preparing them for sale would have exceeded the anticipated selling price.

■ The legislative solution proposed by the Commission to solve the problem of a continuing indebtedness on loans secured by nonpurchase-money household goods was two-fold:

1. If the value of the collateral was less than the debtor's exemptions,

 (a) the collateral would be freed from the encumbrance of the security agreement, and

 (b) the debt would be extinguished, so that there would be no consideration to support a subsequent reaffirmation agreement.

2. If the value of the collateral was greater than the debtor's exemptions, the debtor would be able to purchase the collateral for the amount of the excess.

As a matter of court procedures, part 1(b) of the proposal would have been chaotic because it was directly contrary to nine centuries of contract law and four centuries of bankruptcy law. Furthermore it was contrary to another principle of bankruptcy reformers, which is to cause the results of bankruptcy law to parallel as closely as possible the results of nonbankruptcy law.

The Congress followed to a large extent the program of the Commission except that:

1. It decided to retain judicial control over the bankruptcy process instead of causing it to become an executive function, and

2. It retained the concept of discharge under which the debt continues but is no longer enforceable.

■ As will be observed, the lien avoidance aspects of § 522(f) fit exactly into an overall comprehensive pattern of providing a fresh start for the debtor. It is not the province of this Court, nor of any other court, to determine whether the goal of the Congress was wise nor whether the method selected to achieve that goal would be effective. Public policy is a matter within the realm of the legislature and not of the judiciary. The Congress has the opportunity and the funds to investigate and to hold hearings, which the Courts do not; it has the capability of balancing the viewpoints of many varied interests, whereas the Courts are fairly well confined to selecting between two adversary positions; the Congress is closer to the people because all of its members are elected, and the judiciary is appointed, or if elected, has longer terms; and finally the legislature is in the rough-and-tumble of everyday life, whereas the judiciary is expected to maintain a discreet aloofness. The Courts may examine into the purposes and effects of legislation to determine whether it is capricious, arbitrary or unreasonable, but if the Congress acted within its powers, it is immaterial that the Courts might have done things differently.

■ The Bankruptcy Code is recognized generally as being a debtor-oriented statute; but the Constitution does not say anything about trends or balances; the Constitution requires the law to operate uniformly, which this act does as that term was construed by the Supreme Court in *Hanover Bank v. Moyses*.[58]

It can be argued that Congress has not ever held unconstitutional a bankruptcy act dealing with individuals. *Ashton v. Cameron County Water Improvement District*[59]

**58.** 186 U.S. 181, 22 S.Ct. 857, 46 L.Ed. 1113 (1902).

**59.** 298 U.S. 513, 56 S.Ct. 892, 81 L.Ed. 1309 *reh. den.* 299 U.S. 619, 57 S.Ct. 5, 81 L.Ed. 457 (1936).

held unconstitutional under the Tenth Amendment the first Chapter IX, relating to reorganization of municipalities:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people."

The Congress produced a revised Chapter X shortly thereafter, limiting municipal reorganization to voluntary proceedings, which was upheld in *United States v. Bekins.*[60]

The only other legislation held unconstitutional was the first Frazier-Lemke Act by *Radford,* discussed above. It can be argued that this was just a stay law which had been appended to a bankruptcy act and not a bankruptcy act in itself. It was not a part of comprehensive legislation and did not deal with the rights of creditors among themselves. But the point about whether or not any bankruptcy act has ever been held unconstitutional is not important. The Supreme Court has in the past, and in the future in all likelihood will continue to, construe broadly the Congressional authority to mold the implementations of this express Constitutional power.

### SECTION 522(f)

"Notwithstanding any waiver of exemptions, the debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is ___

(1) a judicial lien; or

(2) a nonpossessory, nonpurchase-money security interest in any ___

(A) household furnishings, household goods, wearing apparel, appliances, books, animals, crops, musical instruments, or jewelry that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor;

(B) implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor; or

(C) professionally prescribed health aids for the debtor or a dependent of the debtor."

The subsection (b) referred to above, in effect, provides:

(1) that the eleven classes of property or rights, described in subsection (d) are exempt unless State law does not authorize the Federal exemptions, or

(2) the exemptions provided under Federal non-bankruptcy law plus the State exemptions apply, plus

(3) any interest of the debtor in property held as a joint tenant or tenant by the entirety to the extent that local law permits.

All that need be said at this juncture is that some of the Federal exemptions represent a significant and substantial amount of money, so that as a theoretical possibility § 522(f) might affect collateral with a substantial value. It need not, however, and the legislative history of the Code indicates that the view of the Congress was that to the extent that the collateral consisted of nonpurchase money nonpossessory liens on household goods, it would not.[61] Disregarding for the moment that portion of the seven security interests which consist of automobiles (one of them also had a motorized lawn motor and a snowmobile) and also passing for the moment the subject of the judicial lien, the remainder of the security interests are in household furnishings, household goods, wearing apparel and appliances, all of which were owned by the consumer, debtor prior to his making the loan with respect to which that personalty became a security interest.

§ 522(f) follows the general pattern of the Bankruptcy Commission Bill, introduced in the House as H.R. 31 of the 94th Congress, which provided:

**60.** 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137, *reh. den.* 304 U.S. 589, 58 S.Ct. 1043, 82 L.Ed. 1549 (1938).

**61.** "[T]he items have little if any realizable market value." H.R.Rep.No.595, 95th Cong., 1st Sess. 127 (1977), U.S.Code Cong. & Admin. News 1978, 5787, 6088.

"§ 4–503 Exemptions

(f) Waiver: Liens

... A lien obtainable by legal or equitable proceedings, and, with respect to wearing apparel, household goods, and health aids, any lien created by agreement to give security other than for a purchase money obligation, is unenforceable against the property allowed to the debtor pursuant to this section as exempt, except that such lien may be preserved for the benefit of the debtor."

Those recent cases which have purported to follow *Radford* in interpreting § 522(f) have chosen to ignore the precept of that case that it is the taking of property of substantial value which is deemed to affront the Fifth Amendment. Most of those cases have not considered whether or not the security interests before them represented substantial value nor have they considered that the party desiring to rebut the assumption of the Congress that nonpossessory, nonpurchase-money liens in household

goods have no value, or only nominal value, has the burden of going forward with the proof. No decision comes to mind which based its finding of unconstitutionality on the ground that in that particular case it had been established that the security interest did have a significant value. With respect to three cases before us which has raised the issue of value in the pleadings, we shall have to wait to see whether or not the secured creditor is able to establish significant value in the household goods, which he will have an opportunity to do at a hearing to be set in July.

The testimony before the Bankruptcy Commission and the Congressional Committees is to the effect that the finance companies did not look to nonpurchase-money security interests as an available source of funds in the event of default but considered them as a threat to force reaffirmations, as the goods did have a high value to the debtor because he would have had the necessity of replacing them if they had been picked up by the secured creditor.[62] This

---

62. This was conceded by the prepared statement of the leading proponent of the consumer finance companies, Alvin O. Wiese, Jr., Chairman of the National Consumer Financial Association Subcommittee on Bankruptcy.

"Section 522(e) allows the debtor to avoid a non-purchase money security interest in household furnishings, household goods, and other personal property to the extent that the lien impairs an exemption in such property. This provision is apparently designed to help debtors retain possession of items bearing greater sentimental (personal) value than market value ... Such property may not have a great deal of monetary value in the market place, but it does have a substantial value to both the creditor and the consumer as security has a recognizable psychological value. Both the consumer and the creditor realize the property does not have the same value as when it was new, and that it has a high replacement cost for the consumer."

*Bankruptcy Reform Act of 1978: Hearings Before the Subcomm. on Improvements in Judicial Machinery of the Comm. on the Judiciary of the United States Senate*, 95th Cong., 1st Sess. 651 (1977) (statement of Alvin O. Wiese, Jr.).

Speaking with respect to redemptions under section 4–504 of H.R. 31, the representative of the American Bankers Association and the Consumer Bankers Association Task Force on Bankruptcy stated,

"We would support this Section if purchase money obligations were excluded from its operation."

*Hearings on H.R. 31 and H.R. 32, supra* note 7 at 1025 (statement of Walter W. Vaughan).

The use of security interests in consumer goods was discussed by an attorney for the Division of Special Projects, Bureau of Consumer Protection, Federal Trade Commission.

"One of the most important and widely abused devices available to the large credit institution is a blanket security interest in household necessities. As a practical matter, our files reflect that household goods are rarely seized.... Household goods have little or no direct economic value in the resale market.....

The blanket security interest in household goods, combined with the related boilerplate of statutory exemptions has at least three uses. It is an effective lever for securing refinancings at appropriate states of the economic cycle. It is used occasionally for limited economic recovery by actual seizure of the property. Finally, a blanket lien on household goods is among the most effective levers available for securing an anticipatory reaffirmation of a debt which is otherwise dischargeable in bankruptcy.

Based on the cases we examine in our investigation, and on the findings and recommendations prepared by the National Commission on Consumer Finance, we believe

Court has not been able to obtain statistics which differentiate between the repossession of purchase money household goods and nonpurchase money household goods and bear on what use the secured creditor has made of the collateral after default. Obviously the purchase money collateral would have a greater value because it was new at the time of the loan and the nonpurchase money collateral was old and used. Thus the odds are that purchase money collateral would have been picked up much more frequently than nonpurchase money collateral. The 1980 Annual Report of the Illinois Department of Financial Institutions discloses that for the year ended December 31, 1979, there were 31,201 delinquent loans held by consumer finance companies and that during the year 25 actions to recover non-automotive personal property had been prosecuted which produced average gross receipts of $390. No figures are given for the costs of collection, but they must have been large in relation to the receipts. As stated above, the probabilities are that a high percentage of those cases represented purchase money collateral. Loans secured by automobiles represented one-sixth as many loans as those secured by household furnishings but five times as many forced sales, a 30 to 1 ratio producing average gross receipts of $896. Presumably the costs of collection for an automobile would be less because a single repossessor could drive the car back, whereas a truck and crew would be required to repossess furniture.

■ Various changes from the Bankruptcy Act to the Bankruptcy Code demonstrate an intention on the part of the Congress to provide economic assistance to the wage earning class of Americans. The subsection under discussion relates to lien avoidance, but there were other sections providing for an increase in priority wages,[63] broader personal exemptions,[64] redemption of encumbered property,[65] narrower exceptions to discharge,[66] and, in plans for persons with a regular income, protection for co-debtors,[67] and discharges from all debts except for alimony and support.[68] This is mentioned to emphasize that § 522(f)(1) and (2) are a part of a broad, comprehensive, intentional, purposeful design to enable debtors finally to achieve the "fresh start" that has been referred to in so many cases as the objective of bankruptcy legislation.[69] In the single entry method of

that there is no justification whatsoever for the common practice of requiring debtors to pledge all of their household property to small lenders.... We can conceive of few practices in today's consumer market which are more debilitating and demoralizing than the repeated threat to seize the household necessities of an insolvent and his family, items which as a practical matter, have little if any economic value to the creditor. These kinds of threats do not enhance the economic situation of either party. They subvert the specific policy which underpins personal bankruptcy."
*Hearings on H.R. 31 and H.R. 32, supra* note 7 at 761–62 (statement of David H. Williams).
The value should be the value to the secured creditor because it is he who is contending that he has been deprived of something of value. The value to him is what he might receive after a sale in a manner prescribed by local law, less whatever were his costs of collection, costs of litigation, attorneys' fees, costs of preparing the merchandise for sale, and so forth. As stated in the Commission Report:
"The most appropriate standard is the net amount the creditor would receive were he to repossess the collateral and dispose of it as permitted by the applicable nonbankruptcy law."
*Commission Report, supra* note 51 at 131 (Part II).

**63.** 11 U.S.C. § 507(a)(3) (1979).

**64.** 11 U.S.C. § 522(d) (1979).

**65.** 11 U.S.C. § 722 (1979).

**66.** 11 U.S.C. § 523 (1979).

**67.** 11 U.S.C. § 1301 (1979).

**68.** 11 U.S.C. § 1328(a)(2) (1979).

**69.** *See e. g. Local Loan Co. v. Hunt,* 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *United States v. Sotelo et Ux,* 436 U.S. 268, 98 S.Ct. 1795, 56 L.Ed.2d 275 (1978); *Wright v. Vinton Branch of the Mountain Trust Bank of Roanoke,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); *Segal v. Rochelle,* 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). *See also Matter of Kasler,* 611 F.2d 308 (9th Cir. 1979); *Matter of Smith,* 640 F.2d 888 (7th Cir. 1980); *In re*

accounting which bankruptcy is, a benefit to a debtor almost necessarily is a detriment to a creditor. It is a function of the Congress to set the balance where it desires, and the 95th Congress merely has accentuated a trend which has been followed by the Crown or by the legislatures for four hundred twelve years.[70]

 The Congress has determined that as a generality nonpurchase money, nonpossessory liens in household goods have little or no value and has legislated accordingly. Any person whose views are to the contrary has the burden of establishing that the Congress was in error. In fifteen of the cases which are consolidated here for the purpose of trial and argument the issue of value has not been raised. At to those cases, § 522(f)(2)(A) is held to be controlling, and the liens created on household furnishings, household goods, wearing apparel and appliances owned by the debtor prior to incurring the debt for which they were to act as a security interest are held to be void.

 With respect to the three cases in which it has been alleged that the household goods have a greater than nominal value, a hearing will be set in July for the purpose of valuing the goods, determining whether the lien impairs an exemption of the debtor, and deciding whether an avoidance of all or any part of the lien would constitute a substantial deprivation of the creditors' property right in the goods without due process of law.

 With respect to the seven automobiles, trucks, lawn mower and snowmobile, there has been no allegation that they are used in the debtor's regular work, so that it is unnecessary to determine the possibility that they might fit into the exception of

§ 522(f)(2)(B), "implements . . . or tools, of the trade of the debtor or the trade of a dependent of the debtor." That issue is not before us, and we find that the lien of the security interest is not avoided as to those vehicles.

 Finally, with respect to the judicial lien which resulted from the recording of a money judgment in Cook County, Illinois, where the debtor maintains his residence, we find that the debtor has claimed the $10,000 allowance available to the head of a household as a homestead exemption under Illinois law, which exceeds the amount of the judicial lien ($8,550). The Bankruptcy Code has not affected that homestead right, which existed before and after the enactment of the Bankruptcy Code, except that provision has been made for a judicial determination in this proceeding which will preclude the question's being raised in a state court. We find that the judicial lien is void.

Minute orders will be prepared in each of the nineteen cases consonant with this opinion, respectively setting three cases for future hearing on value, voiding the liens on household goods in all other cases, allowing the liens on motor vehicles and equipment, and voiding the judicial lien.

---

*Becker's Motor Transportation Co.*, 632 F.2d 242 (3rd Cir. 1980).

**70.** "Throughout that evolutionary process [the development of bankruptcy law] the court has hewn a straight path. Disclaiming a willingness to bind itself by a cramping definition, it has been able nonetheless to indicate with clearness the main lines of its approach. In substance, it agrees with Cowen, J., who wrote:

"I read the constitution thus, 'Congress shall have the power to establish uniform laws on the subject of any person's general inability to pay his debts throughout the United States.'"
*Ashton v. Cameron County Dist.*, 298 U.S. at 536–37, 56 S.Ct. at 898–99 (Cardozo, J., dissenting).